# PURCHASE AND SALE AGREEMENT

THIS PURCHASE AND SALE AGREEMENT ("Agreement") is made as of the __20th__ day of March, 2024 (the "Effective Date"), by and between **1416 Eastern AVE NE LLC** ("Seller"), and **TH VENTURES LLC, and/or assigned entity**, its successors and permitted assigns (collectively "Purchaser"). Seller and Purchaser may be referred to individually as a "Party," or collectively as the "Parties."

RECITALS:

WHEREAS, Seller is the owner in fee simple of that certain real property located at **1416 Eastern Avenue Northeast,** in Washington, D.C. 20019, being known for assessment purposes as Square 5171 and Lots 0063, containing an aggregate of six (6) apartment units (the "Building"), together with all improvements, rights, alleys, ways, waters, privileges and easements, furniture, fixtures, equipment and personal property, except such personal property which is the property of tenants (collectively the "Property"); and

WHEREAS, Seller desires to sell the Property to Purchaser, and Purchaser desires to purchase the Property from Seller, for the purchase price and upon the terms and conditions hereinafter set forth.

NOW THEREFORE, in consideration of the mutual promises hereinafter set forth in this Agreement, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. Purchase Price and Incorporation of Recitals.

The purchase price for the Property shall be One Million Eight Hundred Thousand Dollars ($1,800,000.00) ("Purchase Price"), which shall be payable in full at Closing as set forth in this Agreement.

2. Deposit.

Within five ( )5 calendar days following the Effective Date, Purchaser shall deposit with OLYMPIA TITLE ; (the "Title Company ")he sum of Fifty Thousand Dollars ($50,000.00) (such amount, together with any interest earned thereon being referred to herein as the "Deposit") by wire transfer or cashier's check in immediately available funds at Closing. The Deposit shall be placed in an interest-bearing account. Any interest on the Deposit shall automatically become a part of the Deposit and shall be applied to the credit of, or delivered to, Purchaser or Seller in accordance with the terms hereof.

3. Closing.

Unless otherwise agreed by the Parties in writing, closing shall be held at the office of the Title Company, or such other place in the District of Columbia as may be agreed to by Purchaser and Seller, on the Thirtieth (30th) calendar day of April, 2024. As used in this Agreement, (i) "Closing Date" means the date on which Closing shall occur pursuant to this Article 3, and (ii) "Closing" means the consummation of the purchase and sale and related transactions contemplated by this Agreement in accordance with the terms and conditions of this Agreement.

4. Due Diligence Period; Access to Property; Title.

A. The "Due Diligence Period" shall be the period commencing on the Effective Date

and ending at 5:00 p.m. on the seventh (7th) day following the Effective Date (the "Approval Date"). Purchaser shall have the right to terminate this Agreement and obtain the return of the Deposit by delivering written notice to Seller on or before the Approval Date. Provided such notice is timely given, the Parties shall, in such event, thereafter have no further liability to each other under this Agreement, except for those provisions hereof which expressly survive the termination of this Agreement. If Purchaser fails to deliver such timely notice to Seller, then thereafter the Deposit shall be non-refundable, except as provided in Article 10 hereof, and this Agreement shall continue in full force and effect in accordance with its terms.

B. In the event Purchaser or Purchaser's agents conduct destructive testing or otherwise disturb the Property during the Due Diligence Period (or at any time thereafter with Seller's written permission), Purchaser, at Purchaser's sole cost and expense, shall restore the Property to its pre-Due Diligence Period condition. In the event Purchaser, or anyone on Purchaser's behalf, enters upon the Property during the Due Diligence Period to conduct testing or analysis, proof of insurance identifying Seller as an "additional insured" shall be provided prior to such entry.

C. During the Due Diligence Period, Seller shall allow Purchaser or Purchaser's agents or representatives reasonable access to the Property (during normal business hours), for purposes of non-intrusive physical or environmental inspection of the Property, subject to the rights of the tenants in the Property, and review of the leases for the Property, financial condition of the Property and other matters. Purchaser shall give at least two (2) business days' prior notice to Related Parties, to schedule and coordinate every inspection, and Seller reserves the right to have a representative present at such inspection(s). Any inspections shall be at Purchaser's sole cost and expense; and shall be paid for promptly by Purchaser.

D. Within seven (7) days after the Effective Date, Purchaser shall, at Purchaser's sole cost, submit to Seller a current title insurance commitment (the "Title Commitment") issued by the Title Company, together with a written notice from Purchaser or its counsel (the "Title Notice") specifying any alleged defects in or objections to title to the Property (other than the Permitted Exceptions, as hereinafter provided). "Permitted Exceptions" shall include any items shown on the Title Commitment and not objected to in the Title Notice. If Purchaser timely delivers the Title Notice, Seller shall have ten (10) business days after receipt thereof to notify Purchaser in writing (the "Seller's Response") as to which of the objections, if any, Seller will cure. Seller may cure any such objection by, among other things, causing Purchaser's title insurance company to insure over same in a manner reasonably satisfactory, and at no cost, to Purchaser. If Purchaser does not receive Seller's Response within such ten (10) day period, then Seller shall be deemed to have refused to cure all objections. If, within such ten (10) day period, Seller declines to cure all objections on or before the Closing Date, Purchaser, as its sole right and remedy, shall have ten (10) business days either to waive its objections and proceed to Closing, or to terminate this Agreement by delivering written notice to Seller, in which case, the Deposit shall be returned to Purchaser and the Parties shall thereafter have no further liability to each other under this Agreement, except for those provisions hereof that expressly survive the termination of this Agreement. If, within such ten (10) day period, Seller agrees to cure some but not all objections on or before the Closing Date, Purchaser, as its sole right and remedy, shall have ten (10) days within which to either waive the objections as to which Seller declined to cure, or to terminate this Agreement by delivering written notice to Seller, in which case, the Deposit shall be returned to Purchaser and the Parties shall thereafter have no further liability to each other under this Agreement, except for those provisions hereof that expressly survive the termination of this Agreement. If Purchaser does not so terminate this Agreement, those matters Seller has declined to cure shall be deemed additional Permitted Exceptions, except for: (1) taxes then due and payable, (2) mortgage liens created by Seller, and (3) mechanic's liens for work performed by or on behalf of Seller.

E.  The following documents and materials constitute the "Property Documents": (a) Property leases and most current rent rolls, (b) Material Contracts (as defined below), (c) Any existing Environmental Reports in Seller's Possession, (d) the most recent real estate tax and utility bills relating to the Property, (e) operating statements for the Property covering the previous two (2) year period, (f) copies of any and all notices from any governmental authority pertaining to the Property, and (g) rent control reports covering the previous one (1) year period.

5.  Representations and Warranties of Seller.

Seller represents and warrants, to the best of its knowledge, without investigation, and except as set forth in Exhibit A, to Purchaser that:

A.  Seller is validly existing and in good standing under the laws of the District of Columbia, is authorized to enter into this Agreement and consummate this transaction without further consent or approval of any other person or entity, and the consummation of this transaction will not breach or violate any contract or legal duty of Seller.

B.  Any rent roll provided to Purchaser was true and correct in all material respects as of the date provided by Seller.

C.  Except as set forth on Exhibit A, there is no pending or, threatened action, litigation, condemnation or other proceeding against the Property, or against Seller with respect to the Property, by any person, entity or governmental authority.

D.  Purchaser will be given access to or will be provided with all management, leasing, service, maintenance, supply and similar contracts affecting the Property (collectively the "Material Contracts"), and the Seller has not received any notice that the Seller is in default under any Material Contract, nor has Seller given any written notice of default under any Material Contract.

E.  No Bankruptcy/Dissolution Event has occurred with respect to Seller. As used in this Agreement, the term "Bankruptcy/Dissolution Event" means any of the following: (i) the commencement of a case under Title 11 of the United States Bankruptcy Code, as now constituted or hereafter amended, or under any other applicable bankruptcy law or other similar law; (ii) the appointment of a trustee or receiver of any substantial property interest; (iii) an assignment for the benefit of creditors; (iv) an attachment, execution or other judicial seizure of a substantial property interest;
(v) the taking of, failure to take, or submission to any action indicating an inability to meet its financial obligations as they accrue; or (vi) a dissolution, liquidation, death or incapacity.

F.  Seller has complied or will comply with the requirements described in Article 7 below.

6.  Representations and Warranties of Purchaser.

A.  Purchaser is validly existing and in good standing under the laws of the state of its formation set forth in the initial paragraph of this Agreement, is authorized to enter into this Agreement and consummate this transaction without further consent or approval of any other person or entity, and the consummation of this transaction will not breach or violate any contract or legal duty of Purchaser.

B.  No Bankruptcy/Dissolution Event or other action under federal or state bankruptcy law is pending against Purchaser.

C. On or before the Approval Date, Purchaser shall have (a) inspected the Property fully and completely at its expense and will have ascertained to its satisfaction the extent to which the Property complies with applicable zoning, building, environmental, health and safety and all other laws, codes and regulations; (b) reviewed the Property Documents and other matters relating to the Property, and (c) based upon its own investigations, inspections, tests and studies, shall have determined whether or not to purchase the Property and to assume Seller's obligations under the Leases, the Material Contracts, and otherwise with respect to the Property.

D. Purchaser (i) is not in receivership or dissolution; (ii) has not made an assignment for the benefit of creditors or admitted in writing its inability to pay its debts as they mature; and (iii) has not been adjudicated a bankrupt or filed a petition in voluntary bankruptcy or a petition or answer seeking reorganization or an arrangement with creditors under the federal bankruptcy laws or any other similar laws or statutes of the United States or any other jurisdiction and no such petition has been filed against Purchaser. Further, Purchaser has the financial wherewithal to fulfill its obligations hereunder and has provided Seller with accurate financial information concerning its condition.

E. Purchaser has no knowledge of any litigation pending or threatened against Purchaser which could adversely affect its ability to carry out its obligations hereunder.

F. Purchaser is not acting directly or indirectly for, or on behalf of, any person, group, entity or nation named by any Executive Order or the United States Treasury Department as a terrorist, "Specifically Designated National and Blocked Person" or other banned or blocked person, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, and is not engaging in the transaction described herein, directly or indirectly, on behalf of, or instigating or facilitating the transaction described herein, directly or indirectly, on behalf of any such person, group, entity or nation.

7. Conversion and Sale Act.

A. As and if applicable, Seller shall comply with all applicable requirements of the District of Columbia Rental Housing Conversion and Sale Act of 1980, as amended and the regulations promulgated thereunder (said Rental Housing Conversion and Sale Act of 1980, as amended, and administrative regulations promulgated thereunder being hereinafter collectively referred to as the "Conversion and Sale Act"), commencing with delivery by Seller or its agents of a notice to each tenant at the Property with a copy of such notice to the Mayor of the District of Columbia (in accordance with the Conversion and Sale Act) advising said tenants of their rights under Subchapter IV of the Conversion and Sale Act. Seller shall mail such notice via certified mail to each tenant at the Property within five (5) business days following confirmation (by execution of this Agreement) from the Title Agent that it has received the Deposit from Purchaser with a copy via certified mail to the Mayor of the District of Columbia.

B. Upon reasonable notice to Seller and Related Parties, Purchaser shall have the right to contact and negotiate with the tenants of the Property in relation to their rights under the Conversion and Sale Act. Seller shall be provided reasonable advance written notice of any meeting with any of the tenants, and Seller, Related Parties and/or their representatives may participate in such meeting(s). Purchaser shall keep Seller reasonably apprised of any such meetings and negotiations and any other communications with the tenants of the Property and/or their authorized representatives.

C. Promptly following the date the rights of the tenants and/or the duly formed tenants association under the Conversion and Sale Act to purchase the Property have been released, expired, or waived, Seller shall use best efforts to obtain such documentation (collectively, the "Tenant Purchase

Rights Expiration Notice") to demonstrate that Seller has complied with the requirements of the Conversion and Sale Act and as reasonably required by the Title Company to enable the Title Company to issue a title policy without exception for tenant rights under the Conversion and Sale Act. Notwithstanding the foregoing, if Purchaser enters into an agreement with the tenants association for the Property, Purchaser shall provide Seller a copy of such executed agreement and shall use commercially reasonable efforts to ensure that such agreement requires such association to execute such documents as may be reasonably required by the Title Company to issue a title policy without exception for tenant rights under the Conversion and Sale Act.

8. If a tenant organization ultimately purchases the Property, then this Agreement shall automatically terminate at the time of the closing under such contract, and Purchaser shall be entitled, without demand, to receive a return of the Deposit, and the Parties shall thereafter have no further obligations to each other, except for those provisions hereof that expressly survive the termination of this Agreement.

9. Covenants. Until the Closing Date or the sooner termination of this Agreement (i) Seller shall maintain and operate the Property in its normal course of business, subject to reasonable wear and tear, and (ii) shall not enter into any additional service contracts, equipment leasing contracts, or other similar agreements without the prior consent of Purchaser (which consent shall not be unreasonably withheld, conditioned or delayed), except for those contracts deemed reasonably necessary by Seller which are cancelable on 30 days' notice.

10. <u>Conditions Precedent to the Obligations of Purchaser.</u>

A. The obligations of Purchaser to purchase the Property pursuant to the provisions of this Agreement shall be subject to the following conditions (all or any of which may be waived in writing, in whole or in part, by Purchaser):

(i). The representations and warranties made by Seller herein shall be true and correct in all material respects when made.

(ii). On the Closing Date, the condition and status of title to the Property shall be as stated and required hereunder, and the Title Company shall have issued a title policy, or an unconditional commitment to issue same, reflecting the condition and status of title required hereunder, which title policy shall not contain any exceptions for any matters related to the Conversion and Sale Act.

(iii). Seller shall have received the Tenant Purchase Rights Expiration Notice, or similar document confirming that any tenant organization formed with the intent of acquiring the Property has elected not to purchase the Property.

B. Failure of a Condition Precedent. If any of the above conditions precedent to Purchaser's obligation to Purchase the Property has not been satisfied as of the Closing Date, the Purchaser may, so long as it has satisfied its obligations under this Agreement, (i) terminate this Agreement by delivering written notice to Seller on or before the Closing Date, in which case the Deposit shall be returned to Purchaser, this Agreement shall terminate, and the Parties shall have no further obligations hereunder, except for those provisions which expressly survive termination of this Agreement (ii) elect to extend the Closing until such condition is satisfied, but in no event for more than thirty (30) days, unless otherwise mutually agreed in writing by the Parties or (iii) proceed to Closing notwithstanding the non-satisfaction of the condition(s) precedent, in which event the Purchaser shall be deemed to have waived such condition(s).

11. Documents and Payments at Closing.

    A. Seller Deliveries. At Closing, Seller shall deliver to the Title Company the following:

        (i). A duly executed original certificate of "non-foreign" status;

        (ii). If they are then in Seller's possession, and have not theretofore been delivered to Purchaser: (a) any plans and specifications for the improvements on the Property; (b) all unexpired warranties and guarantees which Seller has received in connection with any work or services performed with respect to, or equipment installed in, the Improvements; (c) all keys and other access devices for the Property; (d) originals of all leases, all correspondence to or from any tenants, relating to the leases for the Property; and (e) originals of all contracts that will remain in effect after the Closing and all correspondence relating to the on-going operations and maintenance of the Property (which materials under this clause (e) may be either delivered at Closing or left at the management office at the Property); and(iii) Such additional documents as may be reasonably required by Title Company in order to consummate the transactions hereunder.

    B. Purchaser Deliveries. At Closing Purchaser shall deliver to the Title Company the following:

        (i). The Purchase Price in immediately available federal funds; and

        (ii). Such additional documents as may be reasonably required by Seller and Title Company in or to consummate the transactions contemplated by this Agreement.

    C. Mutual Deliveries. Purchaser and Seller shall mutually execute and deliver to the Title Company, the following:

        (i). A Closing statement reflecting the Purchase Price, and the adjustments and prorations required hereunder and the allocation of income and expenses require hereby; and

        (ii). Such additional transfer tax forms as required by the District of Columbia and any other government authorities.

12. Prorations and Closing Costs.

    A. Seller and Purchaser shall prorate, as of midnight on the day before the Closing Date (the "Apportionment Date"), all rents and all other pro-ratable items including, without limitation, taxes, utilities, permit fees, insurance, and other costs relating to the ownership and operation of the Property. Purchaser shall be responsible for all dealings with utility service providers with respect to any actions necessary to change over accounts to Purchaser as of the Closing Date.

    B. The prorations and payments shall be made on the basis of a written statement submitted to Purchaser and Seller by Title Company at least three (3) business days prior to the Closing and approved by Purchaser and Seller.

C. Except as may otherwise be provided in this Agreement, expenses of examination of title, title insurance, conveyancing, settlement fees, tax certificates, notary fees, and recording fees shall be paid by Purchaser. The applicable District of Columbia Deed Recordation Tax and Real Property Transfer Tax shall be shared equally by Purchaser and Seller in accordance with customary practices in the District of Columbia. Each party shall pay its own attorneys' fees incurred.

13. <u>Disposition of Deposit upon Default.</u>

A. <u>Default by Seller</u>. If the transaction herein provided shall not be closed solely by reason of Seller's default under this Agreement, or the failure of satisfaction of the conditions benefiting Purchaser under Article 10, or the termination of this Agreement in accordance with Article 13, then the Deposit shall be returned to Purchaser (and neither Party shall have any further obligation or liability to the other except for such obligations that expressly survive such termination hereunder); provided however, if the transactions hereunder shall fail to close solely by reason of Seller's default, and Purchaser shall have fully performed its obligations hereunder and shall be ready, willing and able to close, then as its sole and exclusive remedy (Purchaser hereby waiving all other rights and remedies with respect to such Seller default), (i) Purchaser shall be entitled to terminate this Agreement (in which event the Deposit shall be returned to Purchaser and neither Party shall have any further obligation or liability to the other except for such obligations that expressly survive such termination hereunder), or, (ii) Purchaser shall be entitled to bring an action for specific performance to enforce this Agreement (and Purchaser shall not be entitled to bring any other action, for any other damages or otherwise against the Seller or the Related Parties, by reason of a default by Seller prior to Closing). Any such action for specific performance must be brought, if at all, within thirty (30) days after the Closing Date

B. <u>Default by Purchaser</u>. If the sale of the property shall not be consummated on account of Purchaser's default, then Purchaser shall be deemed to have forfeited the Deposit and the Title Company shall promptly deliver the Deposit to Seller as its sole and exclusive remedy under this Agreement as liquidated damages (it being agreed that actual damages would be impossible to determine as the Property will be removed from the market) subject to, and without limitation on, the provisions of this Agreement that expressly survive a termination of this agreement.

14. <u>Condemnation or Destruction of Property.</u>

Seller shall bear the risk of loss until the Closing and promptly notify Purchaser of any casualty or other material damage to the Property. In the event of a casualty that cannot be substantially repaired before the Closing, or a taking of more than twenty percent (20% of the Property by eminent domain, Purchaser shall have the right to terminate this Agreement and obtain the return of the Deposit by delivering written notice to Seller within ten (10) days of Seller's notice of same, or, if not timely terminated, shall proceed to Closing and shall receive a credit to the Purchase Price in an amount mutually agreeable to Purchaser and Seller.

15. <u>Purchaser's Further Obligations Upon Termination of this Agreement.</u>

If either Purchaser or Seller elect to terminate this Agreement in accordance with the terms hereof, then within ten (10) days of such election (and such termination shall not become effective until Purchaser satisfies all of its obligations in this Article 15), and provided that Purchaser shall have received a return of the Deposit if Purchaser is entitled thereto, Purchaser shall: (A) promptly return to Seller all Property Documents (and any copies thereof), along with the originals and copies of any other documents provided by Seller to Purchaser in accordance with the terms of this Agreement; and (B) promptly provide Seller with copies of all third party reports and other due diligence materials regarding

the Property then in the possession of Purchaser, its agents, or representatives. This provision and Purchaser's obligations set forth therein shall expressly survive any termination of this Agreement.

16. **THE PARTIES RECOGNIZE AND AGREE THAT PURCHASER IS ACQUIRING THE PROPERTY IN "AS-IS, WHERE-IS" CONDITION, WITH ALL FAULTS. PURCHASER HEREBY ACKNOWLEDGES THAT IT SHALL BE ACQUIRING THE PROPERTY IN RELIANCE SOLELY UPON ITS OWN INVESTIGATIONS, STUDIES AND DUE DILIGENCE AND, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, SHALL NOT REPLY ON ANY STATEMENT, REPRESENTATION, OR WARRANTY WHATSOEVER BY SELLER, RELATED PARTIES OR THEIR RESPECTIVE OFFICERS, DIRECTORS, EMPLOYEES, SHAREHOLDERS, MEMBERS, AGENTS, CONTRACTORS OR REPRESENTATIVES (COLLECTIVELY REFERRED TO IN THIS AGREEMENT AS THE "SELLER/RELATED PARTIES PARTIES"). PURCHASER UNDERSTANDS AND ACKNOWLEGES THAT, EXCEPT AS EXPRESSLY PROVIDED IN THIS AGREEMENT, THE SELLER/RELATED PARTIES PARTIES MAKE NO REPRESENTATIONS OR WARRANTIES RELATING TO THE VALUE, NATURE, QUALITY OR CONDITION OF THE PROPERTY, INCLUDING, WITHOUT LIMITATION, THE WATER, SOIL AND GEOLOGY, THE SUITABILITY OF THE PROPERTY FOR ANY AND ALL ACTIVITIES AND USES WHICH PURCHASER OR ANY TENANT MAY CONDUCT THEREON, THE COMPLIANCE OF OR BY THE PROPERTY OR ITS OPERATION WITH ANY LAWS, RULES, ORDINANCES OR REGULATIONS OF ANY APPLICABLE GOVERNMENTAL AUTHORITY OR BODY, THE DESIGN, CONDITION OR REPAIR OF THE PROPERTY, THE EXPENSE OF OPERATION, INCOME POTENTIAL, COMPLIANCE WITH DRAWINGS OR SPECIFICATIONS, ABSENCE OF DEFECTS, ABSENCE OF FAULTS, FLOODING, OR COMPLIANCE WITH LAWS, RULES AND REGULATIONS, TAXES, THE EXPRESS WARRANTIES OF HABITABILITY, MERCHANTABILITY AND FITNESS FOR A PARTICULAR PURPOSE, OR ANY OTHER FACT OR CONDITION WHICH HAS OR MIGHT AFFECT THE PROPERTY OR THE OWNERSHIP, USE, OCCUPANCY, OPERATION, CONDITION, REPAIR, VALUE, OR INCOME POTENTIAL THEREOF.**

17. <u>Miscellaneous.</u>

    A. All notices and other communications hereunder shall be in writing and shall be deemed to have been duly given (i) upon receipt, if delivered by hand, or (ii) three (3) days after mailing, if mailed, postage prepaid, by certified mail, return receipt requested, (iii) on the date when delivered by facsimile transmission, provided a copy of such notice is simultaneously sent by certified mail, return receipt requested, or (iv) upon the earlier of the business day following sending or actual delivery if sent by Federal Express, USPS Express Mail, or other nationally recognized overnight courier:

    (i) if to Seller, addressed to:

    1416 Eastern Ave NE LLC
    1416 Eastern Ave NE
    Washington DC 20019

    (ii) if to Purchaser, addressed to:
    *TH Ventures LLC, and/or assigned entity*
    *15881 Crabbs Branch Way Ste B*
    *Rockville MD 20855*

Any of the parties may effect a change of address by written notice to the other parties hereto.

    B.    This Agreement shall inure to the benefit of and be binding upon the Parties hereto and their respective heirs, administrators, executors, successors and permitted assigns. This Agreement contains the entire agreement between the Parties hereto and there are no promises, agreements, conditions, undertakings, warranties or representations, oral or written, express or implied, between them other than as herein expressly contained or referred to. This Agreement may not be amended, modified or supplemented, nor may any of the obligations of Seller or Purchaser hereunder be waived, except by a written agreement signed by the Party or Parties to be charged. No waiver of any of the provisions of this Agreement shall be valid unless in writing and signed by the Parties against whom it is sought to be enforced.

    C.    This Agreement shall be construed and interpreted in accordance with the laws of the District of Columbia.

    D.    Notwithstanding anything herein to the contrary, Purchaser shall have the right, upon written notice to Seller, to assign or transfer any of Purchaser's rights, obligations and interests under this Agreement, to a "special purpose entity" of which Purchaser, or any principal in Purchaser or Purchaser's constituent members are an affiliate. Any other assignment of this Agreement by Purchaser shall require Seller's prior written consent, which consent may be withheld in Seller's sole and exclusive discretion. No assignment of this Agreement shall relieve the undersigned Purchaser of its obligations hereunder.

    E.    This Agreement may be executed in counterparts, and all counterparts so executed shall constitute a single agreement, binding upon all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterpart. For all purposes of this Agreement, faxed, electronic, scanned, e-mailed and other electronic media format signatures shall be binding and effective.

    F.    The paragraph headings of this Agreement are for convenience only and in no way limit or enlarge the scope or meaning of the language thereof.

    G.    In the event that any term or provision of this Agreement shall be held illegal, invalid or unenforceable as a matter of law, the remaining terms and provisions of this Agreement shall not be affected thereby, but each such term and provision shall be valid and shall remain in full force and effect.

    H.    Seller and Purchaser acknowledge that each has had the opportunity to have this Agreement reviewed and negotiated by legal counsel of their choosing, and that each has participated equally in the negotiation and drafting of this Agreement. Accordingly, the Parties agree that no court construing this Agreement shall construe it more stringently against one party than against the other.

18.    **Underground Storage Tank Disclosure.**

In accordance to D.C. Code Section 8-113.02, prior to entering into a contract of sale, a seller of real property in the District of Columbia is required to inform prospective buyers of an existence of underground storage tanks on the property or the prior removal of underground storage tanks during the seller's ownership of the property, of which seller has knowledge. If the sale is of commercial property, the

statue also requires a seller to inform a purchaser of any prior use of the property of which the seller has actual knowledge which suggests the existence of tanks on the property. The Parties acknowledge that prior to the execution of this Contract, Seller informed Purchaser that Seller has no knowledge, without investigation, of the current existence or non-existence of underground tanks nor any actual knowledge of any use which would suggest the existence of tanks on the property.

19. Lead-in-Paint Disclosure.

A. Lead Warning Statement. Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the purchaser with any information on lead-based paint hazards from risk assessment or inspections in the seller's possession and notify the Purchaser of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended to Purchaser prior to purchase.

B. Seller's Disclosure. Seller discloses that, to the best of Seller's knowledge, there is not lead-based paint present at the Property. If applicable, Seller has provided a copy of such reports to Purchaser, or will do so with delivery of the Property Documents, or will inform Purchaser in writing that Seller does not have such reports.

C. Purchaser's Acknowledgment. Purchaser acknowledges that it has received (or will receive in connection with delivery of the Property Documents) the reports described above. Purchaser acknowledges receipt of the pamphlet *Protect Your Family from Lead in Your Home*, which can also be found at http://www.epa.gov/lead/pubs/leadpdfe.pdf.

19. Soil Disclosure.

A. To the best of Seller's knowledge without investigation, the characteristic of the soil on the Property, as described by the Soil Conservation Service of the United States Department of Agriculture in the Soil Survey of the District of Columbia published in 1976, and as shown on the Soil Maps of the District of Columbia at the back of that publication, is Urban Land Association.

B. For further information, Purchaser can contact a soil testing laboratory, the District of Columbia Department of Environmental Services or the Soil Conservation Service of the Department of Agriculture.

20. Title Company Provisions.

A. In the event of any dispute between Seller and Purchaser regarding the disbursement of the Deposit, or in the event Title Company shall receive conflicting demands or instructions with respect to the disbursement of the Deposit, Title Company shall withhold disbursement of the Deposit until it receives either (i) joint written instructions from Seller and Purchaser with respect to the disbursement of the Deposit or (ii) a final, non-appealable, unstayed order biding upon it from a court of competent jurisdiction with respect to the disbursement of the Deposit. Notwithstanding the foregoing, in the event of any such dispute or conflicting demands or instructions, Title Company shall have the right to deliver the Deposit into the registry of any court of competent jurisdiction, and Title Company shall thereupon be released from any further liabilities or obligations with respect to the Deposit

        B.      Title Company shall receive no compensation for its services performed pursuant to this Agreement, except for customary fees charged to a purchaser at closing, and except for reasonable attorneys' fees and costs incurred as a result of any dispute between Seller and Purchaser. In the event of any such dispute, the Title Company's fees and costs shall be borne by the Party adjudged by a court or competent jurisdiction to have been at fault.

        C.      Title Company may act upon any instrument or writing believed by it in good faith to be genuine and executed by the proper person, and shall not be liable in connection with the performance of its duties except in the event of the willful misconduct or gross negligence of Title Company or its agents or employees.

        D.      In the event there exists a dispute between Seller and Purchaser as to the disbursement of the Deposit, and a court of competent jurisdiction determines that the Deposit should have been disbursed to either Seller or to Purchaser, then in addition to all other amounts payable under this Agreement, and notwithstanding any limitation set forth in this Agreement on the liability of any Party, the non-prevailing Party in such litigation or proceeding shall pay all fees and expenses (including, without limitation, court costs and reasonable attorneys' fees) incurred by the other Party in obtaining the release of the Deposit.

21.      No Waiver. No waiver by either party of any failure or refusal by the other party to comply with its obligations hereunder shall be deemed a waiver of any other or subsequent failure or refusal to so comply.

22.      Recordation.

Neither this Agreement nor any memorandum or notice of this Agreement may be recorded by any party hereto without the prior written consent of the other Party hereto. The provisions of this Article 22 shall survive Closing or any termination of this Agreement.

23.      Waiver of Jury Trial.

Seller and Purchaser hereby waive trial by jury in any action, proceeding or counterclaim brought by any party against another party on any matter arising out of or in any way connected with this Agreement.

24.      Time is of the Essence.

Time shall be of the essence with respect to each and every obligation under this Agreement.

25.      Confidentiality.

Unless otherwise agreed to herein or in writing by Seller, Purchaser will keep confidential all documents, financial statements, reports or other information provided to, or generated by any party relating to the Property and will not disclose any such information to any person other than (a) members, partners or investors of Purchaser; and (b) those who are actively and directly participating in the evaluation of the Property and the negotiation and execution of this Agreement. However, Purchaser expressly covenants and agrees that it will not disclose any code compliance, environmental or other regulatory matters to governmental or other authorities without the express prior written approval by Seller in its sole discretion unless compelled to do so by law. The provisions of this Article 25 shall survive the termination of this Agreement other than by Closing.

26. <u>Tax Deferred Exchange</u>.

Purchaser and/or Seller may use the Property in connection with a 1031 tax deferred exchange ("Exchange"). The Parties agree to reasonably cooperate with each other and execute such documents as may reasonably be required by each other in order to effectuate an Exchange, provided that no later than five (5) business days prior to the Closing Date, the Party ("Exchange Party") seeking to effectuate an Exchange, delivers to the other Party ("Cooperating Party") copies of all of the documents which the Cooperating Party is required to execute in order to effectuate an Exchange. The Cooperating Party will not assume any liability or cost in connection with an Exchange and the Closing will not be delayed in order to effectuate an Exchange. Either Party's inability to obtain any benefits for an Exchange under Section 1031 of I.R.C. will not relieve such Party of any of its obligations under this Agreement. Seller and Purchaser agree to indemnify, defend and hold the other party harmless from and against any and all actual, out-of-pocket costs, expenses, claims and other liabilities of any kind arising with regard to the effectuation of a tax-free exchange as described herein. Seller shall pay any and all costs associated with such like-kind exchange by Seller, and Purchaser shall pay any and all costs associated with such like-kind exchange by Purchaser. The provisions of this Article 26 shall survive Closing or any termination of this Agreement.

27. <u>Assignment to Seller Designee.</u>

Notwithstanding anything in this Agreement to the contrary, in the event that Purchaser is entitled to and elects to terminate this Agreement in accordance with any of its termination rights set forth herein, Purchaser's election shall be deemed effectively given for all purposes upon Seller's receipt of Purchaser's notice thereof (including Purchaser's right to receive the return of the Deposit to the extent permitted by this Agreement) but no such termination shall be effective for ten (10) days, during which ten (10) day period of time Seller may, at its option, cause Purchaser's interest in this Agreement to be assigned, without recourse or warranty (other than warranties regarding its sole ownership of and no pledge of its interests in the Agreement and its authority to assign its interests in the Agreement), to a third party designated by Seller (such right granted to Seller herein to cause such assignment being an agency coupled with an interest), and in the event of such an assignment, this Agreement shall not terminate but shall continue in full force and effect as so assigned; provided however, that upon such assignment Title Agent shall return the Deposit, or so much of the Deposit as in its possession, to Purchaser, and Seller and Purchaser shall be released from any further rights, liabilities, and obligations under this Agreement, except for those provisions hereof which expressly survive the termination of this Agreement. In the event that Seller causes Purchaser's interest in this Agreement to be assigned pursuant to this Section 27, Seller shall, from and after the effective date of such assignment, indemnify and hold harmless Purchaser from any claims, liability or damages incurred by Purchaser (including, without limitation, reasonable attorney's fees) arising out of or in connection with the assignment of this Agreement; provided, however, that such indemnity shall not extend to protect Purchaser from (and Purchaser shall remain liable for) any of Purchaser's obligations or liabilities which expressly survive the termination of this Agreement. The indemnity set forth in this Article 27 shall survive such assignment.

**THE REMAINDER OF THIS PAGE IS INTENTIONALLY LEFT BLANK**

**SIGNATURES APPEAR ON THE FOLLOWING PAGE**

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first hereinabove written.

**PURCHASER:**

**TH VENTURES LLC, and/or assigned Entity**

By: _____

Date: _03-20-2024_

Name: Wilbur McReynolds


**SELLER:**

1416 EASTERN AVE NE LLC


By: _____

Date: _____03-20-2024_____

Name: Sadegh Jafari, Member

Addendum to Purchase to Sales Agreement

On this 1st day of May, 2024, the Purchaser will use the name 1416 Eastern Property LLC as the purchasing entity.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the day and year first hereinabove written.

**PURCHASER:**

**TH VENTURES LLC, and/or assigned Entity**

By: _[signature]_____

Date: _05-01-2024_

Name: Wilbur McReynolds


**SELLER:**

1416 EASTERN AVE NE LLC


By: _[signature]_____
Date: _05-01-2024_____

Name: Sadegh Jafari, Member