# Marcus & Millichap
## Real Estate Investment Services

## PURCHASE AGREEMENT

THIS DOCUMENT IS MORE THAN A RECEIPT FOR MONEY. IT IS INTENDED TO BE A LEGALLY BINDING AGREEMENT. READ IT CAREFULLY.

Marcus & Millichap Real Estate Investment Services of North Carolina, Inc. ("Agent"), as agent for Marc E. Albert, Chapter 11 Trustee (Case: 24-00180) ("Seller"), shall receive from Craig London or as assigned to one (1) or more single purpose entities ("Buyer") proof of funds deposited into the escrow account of the Title Company identified below in the sum of 1,200,000.00 in the form of CERTIFIED CHECK OR WIRE TRANSFER within three (3) business days after the date that all parties have signed this Purchase Agreement (the "Effective Date"). This sum is a deposit ("Deposit") to be applied to the purchase price of that certain real property (referred to as the "Property") located in Washington, DC, and more particularly described as follows:

Multiple Addresses – See Exhibit A

### TERMS AND CONDITIONS

Seller agrees to sell the Property, and Buyer agrees to purchase the Property, on the following terms and conditions, and subject to Bankruptcy Court Approval:

1) **PURCHASE PRICE:** The Purchase Price for the Property is Seven Million Twenty Thousand Dollars ($7,020,000.00). The Purchase Price, less the amount of the Deposit paid by Buyer, and subject to appropriate adjustments and prorations as hereinafter provided, shall be paid as follows:

2) **EARNEST MONEY:** Within three (3) business days after the execution of this Agreement, Buyer shall deposit with Fidelity National Title Insurance Company, 1620 L Street, NW, 4th Floor, Washington, D.C. 20036, Attn: Michael A. Segal, Esq. (the "Title Company"), the sum of $1,200,000.00 in good funds as an earnest money deposit (the "Earnest Money Deposit"). Until the time of Closing, the Title Company will hold the Earnest Money Deposit in an interest-bearing fiduciary account. Upon the Closing of the Sale to Buyer, the Earnest Money Deposit and all interest earned will be applied toward the Purchase Price. Should the Buyer fail to close in accordance with the terms of this Agreement, the Earnest Money Deposit will be forfeited and the funds delivered to the Seller for the benefit of the Bankruptcy Estate. Should the Seller fail to close in accordance with the terms of this Agreement or should the Bankruptcy Court fail to approve the contemplated sale to Buyer through no fault of the Buyer, the Trustee will return the entire balance of the Earnest Money Deposit to Buyer together with the interest earned. Any disputes regarding the Earnest Money Deposit, the sale contemplated by this Agreement, or regarding the return or disposition of the Earnest Money Deposit shall be decided by the United States Bankruptcy Court for the District of Columbia. Any failure by the Buyer to post the Earnest Money Deposit in accordance with this paragraph will constitute an event of default, in which case Seller may pursue other contracts in addition to reserving all rights against Buyer.

3) **TITLE:** Seller shall convey title to Property free and clear of liens pursuant to Bankruptcy Court Order, including free and clear of any recorded solar panel agreements. Seller shall convey by trustee's deed to Buyer (or such other person as Buyer may specify) marketable fee simple title subject only to the exceptions approved by Buyer in accordance with this Agreement. Title shall be insurable by a standard ALTA owner's policy of title insurance issued by the Title Company with standard exceptions in the amount of the purchase price with premium paid by Buyer. It shall be a condition precedent to Buyer's obligation to close hereunder that the District of Columbia Tenant Opportunity to Purchase Act ("TOPA") will not apply to the sale and at Closing there will be no title exceptions for TOPA. The sale will be free and clear of liens, claims or encumbrances of any sort, including, but not limited to, those arising from violations of Title 14 of the District of Columbia Code of Municipal Regulations. Seller shall not be held responsible to pay fines issued to the Seller prior to closing.

4) **CLOSING:** Closing shall be held no later than <u>THIRTY (30)</u> calendar days after the entry of an order of the U.S. Bankruptcy Court for the District of Columbia approving the sale of the Property under this Agreement (the "Closing Date"), or at such other time as is reasonably agreeable to Buyer and Seller with at least five (5) days' notice prior to the Closing Date. At the Closing, Seller shall execute and deliver to Buyer a trustee's deed subject to those exceptions permitted by this Agreement, a potential assignment and assumption of certain leases in a form reasonably acceptable to Buyer to be decided at a later date prior to closing, an I.R.C. Section 1445 non-foreign affidavit, and any other documents reasonably required by the Title Company, and also a letter reasonably acceptable to Buyer notifying each of the tenants of the Property of the name and address of the Buyer and the location where to send future rent payments; and each party hereto shall execute and deliver such other documents necessary or appropriate to effect and complete the Closing. Notwithstanding anything to the contrary contained in this Agreement, if an order of the U.S. Bankruptcy Court for the District of Columbia approving the sale of the Property under this Agreement has not been obtained and delivered to Buyer on or prior to July 31, 2025, at any time prior to the issuance and delivery to Buyer of such an order, Buyer may terminate this Agreement by written notice to Seller in which event the Deposit shall be promptly returned to Buyer and this Agreement shall terminate.

Real property taxes, premiums on insurance acceptable to Buyer, interest on any debt being assumed or taken subject to by Buyer, and any other ongoing expenses or costs of the continued operation of the Property shall be prorated as of the Closing Date. Security deposits, advance rentals, and the amount of any future lease credits shall be credited to Buyer at Closing. The amount of any assessment not customarily paid with real property taxes shall be (select one "X") _X_ paid _____ assumed by <u>SELLER</u>.

5) **NO FINANCING CONTINGENCY – THERE IS NO FINANCING CONTINGENCY**
6) **INSPECTION CONTINGENCIES – THERE ARE NO INSPECTION CONTINGENCIES**
7) **ASSIGNMENT AND ASSUMPTION OF LEASES:** Seller shall move the Bankruptcy Court (as defined in the Bankruptcy Addendum to Purchase Contract below) for authority to assume and assign to Buyer the existing tenant leases in accordance with the Bankruptcy Code. That motion to assume and assign leases shall be finally determined by the Bankruptcy Court at least ten (10) days before the Buyer is obliged to close on this contract. Buyer will be responsible for addressing any cure amounts and/or providing adequate assurance of future performance to the extent determined or required by the Bankruptcy Court with respect to any assumed and assigned lease. At or before closing, Buyer reserves the right to accept assignment of some, all or none of the tenant leases, in his/its sole discretion. The leases that the Buyer wishes to assume shall be identified at or before Closing by an addendum to this contract. Seller reserves the right to reject all leases in accordance with the Bankruptcy Code, except for any leases specifically identified by the Buyer for assumption and assignment and for which Buyer has provided any required cure amounts or assurances of performance.

8) **LEASED PROPERTY PRORATIONS:** Rents and all other revenue collected by Seller from tenants at the Property (collectively "Rents") for the month in which the Closing shall be prorated at Closing. Seller will assign to Buyer all accounts receivable and claims for past-due rent, and any right to pursue an eviction action on an "as-is, where-is basis." The amount of any unapplied security deposits (together with the interest thereon at the required rate from lease inception until Closing) under the Leases held by Seller in cash at the time of Closing shall be credited against the Purchase Price; accordingly, Seller shall retain the actual cash deposits. For the purposes of calculation of prorated rent and expenses, the Closing Date shall be deemed a day of ownership by the Seller and any rent due for that day shall be credited to the Seller on the settlement statement. Any rents received by Seller or its management agent after Closing shall be promptly delivered to Buyer. Such obligation shall expressly survive the Closing.

9) **PERSONAL PROPERTY:** No personal property will be conveyed to Buyer under the terms of this Agreement except those items which are fixtures on the Property.

10) **CONDITION OF PROPERTY:** It is understood and agreed that the Property is being sold "**AS IS**"; that Buyer has, or will have prior to the Closing Date, inspected the Property; and that neither Seller nor Agent makes any representation or warranty as to the physical condition or value of the Property or its suitability for Buyer's intended use. The parties recognize and agree that Buyer is acquiring the property in "as-is, where-is" condition, with all faults. The Property shall be in substantially the same condition at closing as on the effective date, ordinary wear and tear and damage by casualty excepted. Should the Buyer identify a substantial change in the condition of the Property prior to the Closing Date, Seller shall have the right, but not the obligation, to remedy the change such that the Property is in substantially the same condition at closing as on the effective date, ordinary wear and tear and damage by casualty excepted; provided, however, if Seller does not remedy such change, Buyer shall have the right to receive back its Deposit and shall thereafter be relieved of all further liability hereunder. Buyer hereby acknowledges that it shall be acquiring the property in reliance solely upon its own investigations, studies and due diligence and, except as expressly provided in this agreement, shall not rely on any statement, representation, or warranty whatsoever by Seller, Agent or their respective officers, directors, employees, shareholders, members, agents, contractors or representatives (collectively referred to in this agreement as the "Seller/Agent Parties"). Buyer understands and acknowledges that, except as expressly provided in this agreement, the Seller/Agent Parties make no representations or warranties relating to the property including, without limitation, design, condition or repair, value, expense of operation, income potential, compliance with drawings or specifications, absence of defects, absence of faults, flooding, or compliance with laws, rules and regulations, taxes, the expressed warranties of merchantability and fitness for a particular purpose, or any other fact or condition which has or might affect the property or the ownership, use, occupancy, operation, condition, repair, value, or income potential thereof.

Buyer's Initials C L  [initials]

11) **RISK OF LOSS:** Risk of loss to the Property shall be borne by Seller until title has been conveyed to Buyer. In the event that the improvements on the Property are destroyed or materially damaged between the Effective Date of this Agreement and the date title is conveyed to Buyer, Buyer shall have the option of demanding and receiving back the entire Deposit and being released from all obligations hereunder, or in the event one or more real properties are destroyed or materially damaged as provided herein, Buyer shall have the option to purchase the remaining assets. In such instance, an adjusted purchase price ("Adjusted Purchase Price") will be calculated. The Adjusted Purchase Price will be determined by multiplying the total number of units in the properties being conveyed by the average per unit value represented in this agreement, using the unit numbers as shown for each of the properties on Exhibit A to this Agreement. Alternatively, taking such improvements as Seller can deliver together with any insurance proceeds paid or payable to seller in connection with any covered loss. Upon Buyer's physical inspection and approval of the Property, Seller shall maintain the Property through closing in the same condition and repair as approved, reasonable wear and tear excepted.

12) **POSSESSION:** Possession of the Property shall be delivered to Buyer at closing.

13) **LIQUIDATED DAMAGES: By placing their initials immediately below, Buyer and Seller agree that it would be impracticable or extremely difficult to fix actual damages in the event of a default by Buyer, that the amount of Buyer's Deposit hereunder (as same may be increased by the terms hereof) is the parties' reasonable estimate of Seller's damages in the event of Buyer's default in its obligation to close on the purchase of the Property, and that upon Buyer's default in its purchase obligations under this agreement, not caused by any breach by Seller, Seller shall be released from its obligations to sell the Property and shall retain Buyer's Deposit as liquidated and agreed upon damages, which shall be Seller's sole and exclusive remedy in law or at equity for Buyer's default.**

14) **BUYER EXCHANGE:** Seller agrees to cooperate should Buyer elect to purchase the Property as part of a like-kind exchange under IRC Section 1031. Buyer's contemplated exchange shall not impose upon Seller any additional liability or financial obligation, and Buyer agrees to hold Seller harmless from any liability that might arise from such exchange. This Agreement is not subject to or contingent upon Buyer's ability to dispose of its exchange property or effectuate an exchange. In the event any exchange contemplated by Buyer should fail to occur, for whatever reason, the sale of the Property shall nonetheless be consummated as provided herein.

15) **AUTHORIZATION:** Buyer and Seller authorize agent to disseminate sales information regarding this transaction, including the purchase price of the property.

16) **EXCLUSIVE LISTING:** Marcus & Millichap Real Estate Investment Services of North Carolina, Inc. is the exclusive listing broker of the property that is the subject of this transaction. Under District of Columbia law, Marcus & Millichap represents the Seller as the Seller's agent. Marcus & Millichap is not the agent of the Buyer; however, Marcus & Millichap does have the following affirmative legal obligations to the Buyer:

   a. Diligent exercise of reasonable skill and care in the performance of its duties.
   b. A duty of honest and fair dealing and good faith.
   c. A duty to disclose all facts known to it materially affecting the value or desirability of the property that are not known to, or within the diligent attention and observation of, the Buyer.

17) **OTHER BROKERS:** Buyer and Seller agree that, in the event any broker other than Agent or a broker affiliated with Agent is involved in the disposition of the Property, Agent shall have no liability to Buyer or Seller for the acts or omissions of such other broker, who shall not be deemed to be a subagent of Agent.

18) **LIMITATION OF LIABILITY:** Except for Agent's gross negligence or willful misconduct, Agent's liability for any breach or negligence in its performance of this Agreement shall be limited to the greater of $50,000 or the amount of compensation actually received by Agent in any transaction hereunder.

19) **SCOPE OF AGENT'S AUTHORITY AND RESPONSIBILITY:** Agent shall have no authority to bind either Buyer or Seller to any modification or amendment of this Agreement. Agent shall not be responsible for performing any due diligence or other investigation of the Property on behalf of either Buyer or Seller, or for providing either party with professional advice with respect to any legal, tax, engineering, construction or hazardous materials issues. Except for maintaining the confidentiality of any information regarding Buyer or Seller's financial condition and any future negotiations regarding the terms of this Purchase Agreement, Buyer and Seller agree that their relationship with Agent is at arm's length and is neither confidential nor fiduciary in nature.

20) **BROKER DISCLAIMER:** Buyer and Seller acknowledge that, except as otherwise expressly stated herein, Agent has not made any investigation, determination, warranty or representation with respect to any of the following: (a) the financial condition or business prospects of any tenant, or such tenant's intent to continue or renew its tenancy in the Property; (b) the legality of the present or any possible future use of the Property under any federal, state or local law; (c) pending or possible future action by any governmental entity or agency which may affect the Property; (d) the physical condition of the Property, including but not limited to, soil conditions, the structural integrity of the improvements, and the presence or absence of fungi or wood-destroying organisms; (e) the accuracy or completeness of income and expense information and projections, of square footage figures, and of the texts of leases, options, and other agreements affecting the Property; (f) the possibility that lease, options or other documents exist which affect or encumber the Property and which have not been provided or disclosed by Seller; or (g) the presence or location of any hazardous materials on or about the Property, including, but not limited to, asbestos, PCB's, or toxic, hazardous or contaminated substances, and underground storage tanks.

Buyer agrees that investigation and analysis of the foregoing matters is Buyer's sole responsibility and that Buyer shall not hold Agent responsible therefor. Buyer further agrees to reaffirm its acknowledgment of this disclaimer at closing and to confirm that it has relied upon no representations of Agent in connection with its acquisition of the Property.

Buyer's Initials _CL_   Seller's Initials _MM_

21) **LEAD-BASED PAINT HAZARDS:** Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase. (SELLER TO INITIAL ONE BELOW):

(____) 1. Seller warrants that the Property was constructed after 1978.
( X* ) 2. Seller has no knowledge of lead-based paint and/or lead-based paint hazards in the housing.

*Seller is a Chapter 11 Bankruptcy Trustee and has no personal knowledge with regard to the Property. All disclosures made are on information and belief only.

22) **MOLD/ALLERGEN ADVISORY AND DISCLOSURE:**  Buyer is advised of the possible presence within properties of toxic (or otherwise illness-causing) molds, fungi, spores, pollens and/or other botanical substances and/or allergens (e.g. dust, pet dander, insect material, etc.).  These substances may be either visible or invisible, may adhere to walls and other accessible and inaccessible surfaces, may be embedded in carpets or other fabrics, may become airborne, and may be mistaken for other household substances and conditions.  Exposure carries the potential of possible health consequences.  Agent strongly recommends that Buyer contact the State Department of Health Services for further information on this topic.

Buyer is advised to consider engaging the services of an environmental or industrial hygienist (or similar, qualified professional) to inspect and test for the presence of harmful mold, fungi, and botanical allergens and substances as part of Buyer's physical condition inspection of the Property, and Buyer is further advised to obtain from such qualified professionals information regarding the level of health-related risk involved, if any, and the advisability and feasibility of eradication and abatement, if any.

Buyer is expressly cautioned that Agent has no expertise in this area and is, therefore, incapable of conducting any level of inspection of the Property for the possible presence of mold and botanical allergens.  Buyer acknowledges that Agent has not made any investigation, determination, warranty or representation with respect to the possible presence of mold or other botanical allergens, and Buyer agrees that the investigation and analysis of the foregoing matters is Buyer's sole responsibility and that Buyer shall not hold Agent responsible therefore.

23) **DISPUTES:**  If a controversy arises with respect to the subject matter of this Purchase Agreement or the transaction contemplated herein (including but not limited to the parties' rights to the Deposit or the payment of commissions as provided herein), Buyer, Seller and Agent agree that such controversy shall be settled before the U.S. Bankruptcy Court for the District of Columbia.

24) **SUCCESSORS & ASSIGNS:** This Agreement and any addenda hereto shall be binding upon and inure to the benefit of the heirs, successors, agents, representatives and assigns of the parties hereto. Any assignee of the Buyer will be required to be identified and disclosed to the Bankruptcy Court and will be required to pass OFAC and AML review to the satisfaction of TD Bank.

25) **TIME:** Time is of the essence of this Agreement.

26) **NOTICES:** All notices required or permitted hereunder shall be given to the parties in writing (with a copy to Agent) at their respective addresses as set forth below.  Should the date upon which any act required to be performed by this Agreement fall on a Saturday, Sunday or holiday, the time for performance shall be extended to the next business day.

27) **ADDENDA:** Any addendum attached hereto and either signed or initialed by the parties shall be deemed a part hereof.  This Agreement, including addenda, if any, expresses the entire agreement of the parties and supersedes any and all previous agreements between the parties with regard to the Property. There are no other understandings, oral or written, which in any way alter or enlarge its terms, and there are no warranties or representations of any nature whatsoever, either express or implied, except as set forth herein.  Any future modification of this Agreement will be effective only if it is in writing and signed by the party to be charged.

28) **GOVERNING LAW:**  This Agreement shall be governed by and construed in accordance with the laws of the District of Columbia and the U.S. Bankruptcy Code.

29) **EMINENT DOMAIN:**  In the event that prior to the closing all or any portion of the Property is condemned, or condemnation proceedings have been instituted by or on behalf of any public or quasi-public entity or for any public or quasi-public use or purpose, then, in the event that such condemnation substantially and materially adversely affects the Property, Buyer shall have the option to: (i) terminate this Agreement and receive the return of the deposit and all interest accrued thereon, or (ii) proceed with the closing and receive a credit against the Purchase Price of any award received or to be received.

30) **SEVERABILITY:**  In the event any term or provision of this Agreement shall be held illegal, unenforceable or inoperative as a matter of law, the remaining terms and provisions of this Agreement shall not be affected thereby and shall remain in full force and effect

31). **BANKRUPTCY:** Seller and Buyer agree and acknowledge that this sale is subject to approval by the United States Bankruptcy Court for the District of Columbia (the "Bankruptcy Court"). Seller may choose to transfer the Property pursuant to a plan confirmed under Section 1129 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Seller may also, in Seller's sole discretion, chose to transfer the Property pursuant to a sale under Section 363 of the Bankruptcy Code without confirming a bankruptcy plan. Notwithstanding anything to the contrary herein or in any other document or agreement: (i) the sale is subject to notice and hearing requirements of the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, the local rules of the Bankruptcy Court, and any requirements established by the Bankruptcy Court; (ii) the sale is subject to approval by the Bankruptcy Court, and as part of the court approval process, this Purchase Agreement is, and will remain, subject to higher and better offers; (iii) the sale may be a necessary component to the consummation of Seller's anticipated bankruptcy plan, and in such a case, no transfer and/or recordation taxes shall be imposed on the transfer of the Property pursuant to Bankruptcy Section 1146(a) and in such a sale, the transfer and/or recordation tax savings will be assigned to the exclusive benefit of the Seller; (iv) the Property will be sold in its "as-is, where-is" condition as of the date of the closing of the sale; (v) any liability of Seller is and will be limited to the return of any deposit paid; and (vii) the Property coveys as tenanted, with no guaranty with regards to the assignment of existing leases, with the tenants having no TOPA rights to a sale in bankruptcy. Seller agrees to provide notice as required by the Title Company to enable issuance of a title insurance policy as described in Section 3 above.

32) **OBLIGATIONS:** Seller's obligations to perform are conditional on Buyer passing OFAC and AML review to the satisfaction of TD Bank.

33) **BREAK-UP FEE:** The order approving the Sale Procedures Motion shall approve Purchaser as the stalking horse bidder for the Property. Upon approval by the Bankruptcy Court of an Alternative Transaction and the closing of that Alternative Transaction, the Buyer shall be entitled to be paid a break-up fee in cash of $250,000.00. The break-up fee shall be paid solely from the proceeds of sale of the Alternative Transaction as a cost of sale.

34) **DUE DILIGENCE DOCUMENTS; ACCESS:** Seller shall cause the property management company for the Property to promptly comply with Buyer's request for documents as such documents are reasonably available, exist within management company's possession, or can be reasonably procured by property management, including, without limitation, the provisions of copies of leases, rent rolls, service contracts and such other items as a buyer of a multifamily property would normally request. In addition, Seller shall cause the property management company for the Property to grant reasonable access to the Property, to Buyer, its potential lenders and investors, and each of their respective agents, employees and contractors, between the date of this Agreement and the Closing.

[SIGNATURE PAGES TO FOLLOW]

THE PARTIES ARE ADVISED TO CONSULT THEIR RESPECTIVE ATTORNEYS WITH REGARD TO THE LEGAL EFFECT AND VALIDITY OF THIS PURCHASE AGREEMENT.

The undersigned Buyer hereby offers and agrees to purchase the above-described Property for the price and upon the terms and conditions herein stated. The undersigned Buyer hereby acknowledges receipt of an executed copy of this Agreement. This Agreement is subject to the attached Bankruptcy Addendum. In the event a conflict exists between this Purchase Agreement and the attached Bankruptcy Addendum, the Bankruptcy Addendum will control.

By: Craig London

BUYER: _(signed)_ Craig London or as assigned to one or more single purpose entities

ADDRESS: 10411 Motor City Dr, Suite 750
Bethesda, MD 20817

DATE: 3/4/2025

TELEPHONE: (240) 432-8877

**SELLER'S ACCEPTANCE AND AGREEMENT TO PAY COMMISSION:**

The undersigned Seller agrees to sell the Property to Buyer for the price and on the terms and conditions stated herein, subject to Bankruptcy Court approval. Seller acknowledges receipt of an executed copy of this Agreement and authorizes Agent to deliver an executed copy to Buyer.

Seller reaffirms its agreement to pay to Agent a real estate brokerage commission pursuant to the terms of that certain Representation Agreement between Agent and Seller effective September 27th, 2024, which shall remain in full force and effect. Said commission is payable in full on the Closing Date and shall be paid in cash at closing from the Seller's proceeds of the sale, subject to Bankruptcy Court approval.

By: Marc. E Albert

SELLER: _(signed)_ Chapter 11 Trustee (Case: 24-00180)

ADDRESS: 1775 Pennsylvania Ave. NW, Ste. 800
Washington, DC 20006

DATE: 3-5-25

TELEPHONE: (202) 728-3020

Agent accepts and agrees to the foregoing.

AGENT: **MARCUS & MILLICHAP REAL ESTATE INVESTMENT SERVICES OF NORTH CAROLINA, INC.**

BY: _(signed)_ John M. Zupancic III

ADDRESS: 7200 Wisconsin Avenue (Suite 1101)
Bethesda, MD 20814

DATE: 3-5-2025

TELEPHONE: (202) 536-3788

PARTIES UNDERSTAND AND ACKNOWLEDGE THAT BROKER IS NOT QUALIFIED TO PROVIDE, AND HAS NOT BEEN CONTRACTED TO PROVIDE, LEGAL, FINANCIAL OR TAX ADVICE, AND THAT ANY SUCH ADVICE MUST BE OBTAINED FROM PARTIES' ATTORNEY, ACCOUNTANT OR TAX PROFESSIONAL.

## Bankruptcy Addendum to Purchase Agreement

1. Marc E. Albert, ("Seller" or "Trustee") is the Court appointed Chapter 11 Trustee for the bankruptcy estate 1416 Eastern Ave NE LLC, *et al.*, (the "Bankruptcy Estate") whose case is currently pending in the United States Bankruptcy Court for the District of Columbia (the "Bankruptcy Court") as Case No. 24-00180.

2. This Purchase Agreement ("Purchase Agreement") and sale of the property are subject to the notice and hearing requirements of the Bankruptcy Code, Bankruptcy Rules, and the Local Rules of the Bankruptcy Court for the District of Columbia.

3. This Purchase Agreement and final sale of the property are subject to Bankruptcy Court approval of sale and assumption and assignment of leases and higher and better offers. Sale is subject to an order of the Bankruptcy Court approving the sale, authorizing sale free and clear of liens and approving the assumption and assignment of tenant leases. Sale is subject to satisfying any of the sub-sections of 11 U.S.C. § 363(b), (f), and (h), or requirements for a sale subject to existing liens, and sections of 11 U.S.C. § 365.

4. The Property is sold in its "as-is" condition as of ratification of a contract. Seller makes no representations as to the condition of the property.

5. The liability of the Seller is limited to the return of the earnest money deposit. The liability of the Buyer is limited to the forfeiture of the earnest money deposit.

6. No sale commission will be due except upon a successful sale and settlement.

7. Seller will convey the Property by Trustee's Deed, free and clear of liens, claims and encumbrances of any sort.

8. All Seller disclosures are upon information and belief only and not personal knowledge.

9. All other terms and conditions of the Sales Contract remain in full force and effect except that if there is a conflict between this Addendum and the remaining portions of the Sales Contract, this Addendum will control.

_____   3-5-25
Seller: Marc Albert, Chapter 11 Trustee (Case No. 24-00180)   Date

_____   3/4/2025
Buyer: Craig London or as assigned entity   Date

_____   3-5-2025
Agent: John M. Zupancic III, Marcus & Millichap   Date

## Exhibit A

| Legal Address | APN |
|---|---|
| 1416 Eastern Avenue NE Washington, DC 20019 (6 Units) | 5171-0000-0063 |
| 4935 Nannie Helen Burroughs Avenue NE Washington, DC 20019 (4 Units) | 5180-0000-0807 |
| 4400 Hunt Place NE Washington, DC 20019 (15 Units) | 5127-0000-0114 |
| 2501 Naylor Road SE Washington, DC 20020 (8 Units) | 5627-0000-0812 |
| 2440 S Street SE Washington, DC 20020 (11 Units) | 5624-0000-0814 |
| 3968 Martin Luther King Jr Avenue SW Washington, DC 20032 (4 Units) | 6150-0000-0002 |
| 4263 6th Street SE Washington, DC 20032 (2 Units) | 6207-0000-0046 |
| 4010 9th Street SE Washington, DC 20032 (12 Units) | 5924-0000-0090 |
| 4303-13 Wheeler Road SE Washington, DC 20032 (42 Units) | 5924-0000-0083 |
| 945 Longfellow Street NW Washington, DC 20011 (13 Units) | 2991-0000-0033 |

Bankruptcy Case No 24-00180 – Purchase Agreement     Buyer's Initials _CL_   Seller's Initials _[signature]_

Copyright Marcus & Millichap 2025